# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

## GHOBAD GHASEMPOUR

I, Robert Pinches, being first duly sworn, depose and state as follows:

## AFFIANT'S BACKGROUND

1. I am a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"). I have served in HSI since December 2010, and have successfully completed criminal investigator training at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). I am currently assigned to conduct investigations involving illegal exports and have successfully completed the Counter-Proliferation Investigations Training course at FLETC. My current responsibilities include investigating the illegal transfer and export of commodities, information, and services from the United States, which are regulated by the United States Departments of State, Commerce, and the Treasury. I have received formal training in the laws and regulations relating to the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120 – 130, as well as the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560. I have conducted and participated in investigations of the above listed laws and regulations.

2. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my review of emails, documentation, and publicly available information, and my conversations with other law enforcement officers. Where the actions, statements, and conversations of others are recounted herein, they are recounted in substance and part, unless otherwise indicated. Where the affidavit contains items in quotation marks, those quotations are based on agent notes and may not be completely verbatim. Because this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested complaint. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## PURPOSE OF AFFIDAVIT

This affidavit is in support of a criminal complaint charging GHOBAD GHASEMPOUR ("GHASEMPOUR") with Conspiracy to unlawfully export U.S.-origin goods to Iran, in violation of 18 U.S.C. § 371, that is, to export the goods without first having obtained the

necessary export license, as required by the IEEPA; International Economic Powers Act violations, 50 U.S.C. § 1705; Iranian Transactions Regulations violation, 31 C.F.R. Part 560.

## EXPORT CONTROL LAWS AND REGULATIONS

### IEEPA, ITSR and EAR

3. IEEPA authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

4. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and … declare[d] a national emergency to deal with that threat."

5. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), implementing the sanctions imposed by the Executive Orders.

6. The ITSR generally prohibit any person from exporting or causing to be exported from the United States any goods, technology, or services without having first obtained a validated export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia. The ITSR imposes, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:

(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

7. On October 15, 2007, the IEEPA was amended to include a criminal conspiracy provision and an increased fine. Title 50, United States Code, Section 1705 provides in pertinent part:

(a) Unlawful acts

It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

* * *

(c) Criminal penalty

A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

8. IEEPA also empowers the U.S. Department of Commerce ("DOC") to issue regulations governing exports. Initially, the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration. Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. See 50 U.S.C. § 1705.

9. Generally speaking, the EAR applies to goods, technology, and software that are "dual use" in nature, meaning that they have military and non-military uses. Among other things, the EAR prohibits the export of certain goods and commodities to specific countries, absent permission from the DOC issued in the form of an export license. Specifically, the DOC has devised the "Commerce Control List" (CCL), see 15 C.F.R. § 774, which consists of general categories of goods that are controlled for export and are so designated by an "Export Control Classification Number" (an "ECCN"). The DOC also has devised the "Commerce Country Chart," see 15 C.F.R. § 738. In the event that a commodity or good is on the CCL, then an exporter must consult the Commerce Country Chart to determine whether an export license from the DOC is required to export the CCL item to a given country.

## FACTUAL BASIS SUPPORTING PROBABLE CAUSE

### GENERAL ALLEGATIONS

#### Background

10. I know from my own training and experience, and the training and experience of law enforcement officers with whom I work, that individuals and companies attempting to circumvent United States export law, including the embargo against Iran, will arrange for

the export of goods from the United States to countries where embargoes are not currently present, such as China, or where companies are more likely to be approved for export licenses, such as Portugal, for transshipment to end-users in Iran.

11. As described below, GHASEMPOUR and YI XIONG ("XIONG"), working out of Canada and China, respectively, have conspired with REZA REJALI ("REJALI"), who works for KIYAN SAYNPANIZ INTERNATIONAL, also known as KSP INTERNATIONAL ("KSP") located in Isfahan, Iran, to procure U.S. commodities for end-use in Iran, in violation of IEEPA.

12. Over the course of the criminal investigation, HSI San Diego applied for and obtained federal search warrants enabling it to obtain electronic communications and related records involving the conspiracy. A review of email communications and related business records revealed that GHASEMPOUR and XIONG were necessary and witting participants in the purchase, export and attempted export of U.S.-origin controlled technologies, for the benefit of REJALI and KSP.

13. The investigation has revealed that GHASEMPOUR is an Iranian-born Canadian national who, working with XIONG, established front companies INTERNATIONAL BUSINESS CENTER TRADE CO. ("IBC TRADE"), MODO INTERNATIONAL ("MODO") and TODI ENTERPRISES ("TODI"), in China and elsewhere, to help his father's Iranian friends illegally launder money and procure goods for Iran. Emails show that GHASEMPOUR started developing procurement and money laundering operations in China as early as December 2011. GHASEMPOUR initiated, planned and directed the scheme, in addition to registering websites and email accounts for some of the front companies he established.

14. XIONG is a Chinese national who manages the day-to-day operations of MODO, TODI, IBC and other front companies involved in the Conspiracy; including the transshipping of goods from the US, Europe and China to Iran at the behest of GHASEMPOUR and REJALI. XIONG provided on-the-ground support in China for GHASEMPOUR and REJALI, which included registering businesses in China; establishing bank accounts to receive Iranian transfers and move money; handling shipments; and purchasing items from Chinese businesses.

15. An individual identified as J.L. is a Chinese national who assisted GHASEMPOUR and XIONG in the operation of MODO.

16. REJALI procured items requested by Iranian end users, whom he referred to as Iranian government agencies, and regularly used GHASEMPOUR and XIONG, and their front companies, as transshippers and procurers. Furthermore, due to the difficulties of moving money out of Iran, REJALI used GHASEMPOUR and XIONG to provide funds and launder money for KSP.

17. MODO, IBC and TODI provided GHASEMPOUR, REJALI and XIONG with the ability to: purchase US items for KSP while disguising the true end user; provide a means of

transshipping items from other procurers to KSP in Iran; and move money out of Iran to China and elsewhere to fund the Conspiracy.

18. FIRSTFIELD ENGINEERING is a Portuguese business that was involved in the procurement and transshipment of US goods for KSP and REJALI.

## THE CONSPIRACY

### Establishment of "NHD" and "MODO"

19. A review of electronic communications and related records between the parties show that GHASEMPOUR, working with XIONG, established a company in 2011, referred to as NHD. The emails reveal that GHASEMPOUR has a 50% ownership of NHD, while XIONG and J.L. each own 25%.

20. On April 20, 2012, GHASEMPOUR emailed XIONG and J.L, stating that he had a new business opportunity regarding NHD. GHASEMPOUR wrote that his father's friend in Iran runs a large paper factory and is very wealthy, but that he had to stop importing paper from Brazil due to new sanctions. GHASEMPOUR wrote that NHD could handle the trade between the Iran factory and China, and that since China purchases oil from Iran, NHD could use the oil money owed from China to purchase items for Iran. GHASEMPOUR wrote that this system would avoid financial difficulties Iran has due to sanctions as they would not need to send money to or from Iran. Additional emails show that J.L. and XIONG started working on this new business plan at GHASEMPOUR's direction.

21. On June 18, 2012, GHASEMPOUR emailed REJALI referencing a previous conversation they had. GHASEMPOUR wrote that he was providing REJALI a bank account associated with GHASEMPOUR's offshore Chinese company, MODO, to use for accepting Euros in China. GHASEMPOUR also wrote that the cost of issuing a Letter of Credit in China is less than 2%.

22. In an email response, REJALI wrote to GHASEMPOUR that his hope was to use GHASEMPOUR's Chinese company to obtain items from other countries for KSP. REJALI wrote that he would send GHASEMPOUR the company names GHASEMPOUR could negotiate with to get the items. REJALI wrote that he was in close contact with GHASEMPOUR's father in Iran and that he would be testing the MODO account's ability to transfer money. GHASEMPOUR forwarded the email on to XIONG.

23. In subsequent emails, REJALI asked GHASEMPOUR if he could obtain a Letter of Credit for an Italian company that REJALI wished to do business with, in the amount of 312,000 Euros, in order to purchase items for KSP. GHASEMPOUR and XIONG replied with a proforma invoice stating that the cost for handling the purchase would require 346,596 Euros - 34,596 Euros more than the cost of the items from Italy. The invoice was provided from MODO. REJALI replied and asked if GHASEMPOUR could

start pricing Hewlet Packard computer servers that he was looking to purchase.

24. On June 24, 2012, XIONG emailed GHASEMPOUR, writing that they could get a Letter of Credit through MODO's existing bank account. XIONG stated that he would leave the decision on how much to charge for the service to GHASEMPOUR. GHASEMPOUR responded in an email to REJALI writing that they could issue the Letter of Credit once MODO's account received the full funds for the purchase from Iran.

25. On June 27, 2012, GHASEMPOUR emailed XIONG and J.L. indicating that he had a "frank" discussion with REJALI and learned that KSP is an Iranian Government engineering company that also purchases items for different Iranian government agencies. GHASEMPOUR wrote that KSP will provide a lot of requests for items, but that the competition for the business is high and MODO may not always win every bid.

26. On June 29, 2012, XIONG emailed GHASEMPOUR and REJALI regarding a new request for items from Cisco, a US company. XIONG wrote that he heard REJALI tell GHASEMPOUR not to mention the items were for end use in Iran. XIONG asked why this was. GHASEMPOUR emailed a reply to XIONG informing him that US companies cannot sell to Iran and that he should not mention Iran to Cisco.

27. On July 23, 2012, GHASEMPOUR emailed XIONG regarding business with REJALI and writing that XIONG should not use their main company, NHD, in China for business with KSP. XIONG responded that he would only use MODO for KSP's business and not NHD.

28. In subsequent emails, GHASEMPOUR, XIONG and REJALI continued to discuss moving money from China for KSP in Iran and the items that GHASEMPOUR and XIONG should purchase using MODO.

29. On October 12, 2015, REJALI emailed GHASEMPOUR writing that he had just finished a meeting for "ship business" and that they had an urgent inquiry regarding sonar systems. REJALI asked GHASEMPOUR to contact his friend to see if they could supply these systems. GHASEMPOUR responded that he would talk to his friend.

30. On October 18, 2015, GHASEMPOUR emailed XIONG and REJALI writing that he had attached Due Diligence paperwork from Vard, a Norweigan company with naval architecture and marine consulting divisions in the U.S. and Canada. The Vard document attached to this email is titled "Anti-Corruption Instruction For The Use Of Agents By Vard." Emails show that GHASEMPOUR is good friends with a Vard employee in Vancouver.

31. On November 9, 2015, GHASEMPOUR emailed his friend at Vard referencing the UN Arms Embargo on Iran and the Joint Comprehensive Plan of Action (JCPOA). The email has the Subject Line of "Potential Opportunities – IR." GHASEMPOUR wrote that the UN was removing the blanket embargo against Iran and that his friend should consult a sanctions lawyer so that Vard could pursue opportunities working with Iran.

GHASEMPOUR also wrote that he had a friend receiving interest from the Iranian Ministry of Defense and that he wanted to set up visits between Vard and Iran in 2016.

32. On November 9, 2015, GHASEMPOUR forwarded the email he sent to Vard to REJALI and asked REJALI to see the email he sent to his friend. GHASEMPOUR wrote that he wanted to be clear on their position so that they could make a final decision on how to proceed. He suggested REJALI read about the JCPOA, as it would be applicable to anything "in this area."

33. It was part of the conspiracy that REJALI, GHASEMPOUR and XIONG engage in illegal financial transactions, involving the above-identified criminally derived property, by assisting in the wiring of Iranian funds to the United States to promote the export, reexport, and attempted export and reexport U.S.-origin goods from the United States to Iran, without having first obtained the required licenses from OFAC, located in the District of Columbia.

<u>Establishment of "TODI" and "IBC"</u>

34. As part of the conspiracy, GHASEMPOUR, REJALI and XIONG attempted to purchase a thin-film measuring system from a California company, Filmetrics. The Filmetrics shipment was detained by authorities in the Netherlands, because MODO was attempting to transship the thin-film measuring system to Iran. Homeland Security Investigations ("HSI") in San Diego, California was notified of the attempted illegal export. HSI then initiated an investigation into the export activities of MODO. Subsequently, GHASEMPOUR, REJALI and XIONG created two new China-based front companies, TODI ENTERPRISES ("TODI") and IBC TRADE CO ("IBC"), to assist in the procurement of items, the transshipping of items, and the movement of money for procurements for end use by KSP in Iran.

35. GHASEMPOUR and XIONG started using TODI, as opposed to MODO, for new orders as they suspected the U.S. Government knew that MODO was procuring items in violation of U.S. sanctions. In addition to the new front company, GHASEMPOUR and XIONG created new email addresses and used aliases when working on TODI business.

36. On June 30, 2014, XIONG emailed GHASEMPOUR and REJALI writing, "New vendor name is TODI from Shanghai, China." Attached to the email was an invoice from TODI detailing the sale of a camera to KSP in Iran.

37. On July 12, 2014, XIONG emailed GHASEMPOUR and REJALI regarding the detained Filmetrics shipment. XIONG wrote that he hoped the Netherlands did not report to the U.S. government or to Filmetrics that the shipment was intended for Iran because, if they did, MODO would lose the machine.

38. On July 13, 2014, GHASEMPOUR emailed XIONG writing that he believed that the transshipers had notified Dutch Customs of MODO's involvement. GHASEMPOUR

suggested that, “It is better for safe purposes that we start a new company and bank account and move future business to it.”

39. On July 21, 2014, XIONG emailed GHASEMPOUR and REJALI regarding Letters of Credit for a different order. XIONG wrote, “our own company (TODI/MODO) can meet all requirement from the customer.”

40. On August 10, 2014, XIONG emailed himself from his MODO e-mail address to a new email address that he would use for TODI business, m_todi@126.com, writing “Test.” Emails show that when using this address, XIONG used the alias “Michael.”

41. On September 21, 2014, REJALI emailed XIONG and GHASEMPOUR writing that he had talked with GHASEMPOUR and that he decided to start a company in China called “IBC International Business Center Trading Co.” REJALI asked how much it would cost and wrote that he needed a bank account as well. REJALI wrote, “Remember all trades over there should be managed by you.” Follow up emails discussed opening the company with one email from REJALI to XIONG and GHASEMPOUR which reads, “Again everything should be under your control. MODO, Todi and IBC will be partners and under our team supervision.” XIONG replied to REJALI and GHASEMPOUR, writing that they couldn’t register the company in REJALI’s name because Iran is under sanctions. Therefore, REJALI would have to personally be in China to open the company in his name. XIONG responded that he would open the company under one of his family member’s name, so as not to connect it with MODO.

42. On October 14, 2014, REJALI emailed XIONG and GHASEMPOUR from a new IBC email account, ibctradeco@gmail.com, indicating that he would use it for IBC related business. XIONG replied to GHASEMPOUR that he would set up new accounts for TODI and MODO as well. Emails show that when using the ibctradeco@gmail.com email address, REJALI would use XIONG’s name as an alias, to hide from his KSP bosses that he was receiving payments as a facilitator apart from his work with KSP.

43. On October 20, 2014, XIONG emailed GHASEMPOUR and REJALI using his TODI account indicating that he will use the attached TODI documents for new and pending orders. Attached to the email are templates for TODI proforma invoices, packing lists and commercial invoices. REJALI replied that these forms, “Seems to be ok. It is different to Modo.” Follow up emails indicate that REJALI wanted to ensure that MODO, TODI and IBC were different in their paperwork so others would believe they were separate companies.

44. On November 10, 2014, XIONG emailed REJALI writing that he had asked GHASEMPOUR to make a new email account for TODI business. After follow up emails to remind GHASEMPOUR to create the account, on December 30, 2014, GHASEMPOUR emailed XIONG and REJAL, stating that he had created a new email account for TODI, cody_todi@yahoo.com. He wrote that the alias for the account was Mr. Cody Goodman.

45. Emails show that after the creation of IBC and TODI, REJALI started routing other procurers in his network through both companies in order to manage purchases for KSP, in part due to XIONG's ability to transship items in China, and in part due to the ease in which XIONG and GHASEMPOUR could move Iranian money through Chinese bank accounts to the rest of the world. REJALI discussed purchases with his procurers using IBC, and then used TODI to issue quotations to his KSP bosses for the costs of purchasing items. TODI bank accounts would move money, at the request of REJALI, for payments and XIONG would handle transshipping items through China to Iran.

The Purchase of Ideal Aerosmith's 2002PG

46. As part of the conspiracy, GHASEMPOUR, XIONG and REJALI, using TODI and IBC, conspired to obtain a 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System made by a North Dakota-based company, Ideal Aerosmith. REJALI, XIONG and GHASEMPOUR planned to use a third-party procurer, FIRSTFIELD, to purchase the Rate Table, due in part to the export license and technical training requirements of the Rate Table. TODI would fund the payment on the Rate Table, though the attempt to acquire the Rate Table ultimately failed following the arrest of one of FIRSTFIELD's engineers.

47. On June 17, 2014, REJALI emailed GHASEMPOUR and XIONG regarding getting price quotes on multiple machines, including one from North Dakota-based Ideal Aerosmith Inc. ("Ideal") – a Rate Table with an AERO 4000 control system.

48. Later that same day, GHASEMPOUR emailed XIONG writing that GHASEMPOUR had spoken with REJALI regarding the new orders. They were the first "trading company" contacted by REJALI regarding the machines, which were expensive. XIONG replied that he would try to meet the orders before other companies could get involved.

49. On June 23, 2014, XIONG emailed REJALI and GHASEMPOUR with an update on the June 17 requests. XIONG wrote that he couldn't purchase the Ideal system locally in China and that he was working with a US supplier. Subsequent emails show that XIONG could not acquire the other items requested, but that he was still working on getting a quote for the Ideal Rate Table.

50. On May 29, 2015, almost a year after the initial inquiry to XIONG and GHASEMPOUR, REJALI, using an IBC company email account, emailed FIRSTFIELD about the Ideal Rate Table project. Follow up emails identified the Ideal system as a 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System[1] and specified that the purchase included the AERO 4000 motion controller. REJALI identified the Ideal order as "Order 15." Documentation from FIRSTFIELD indicated that delivery of the 2002PG would take 7 months from the confirmation of the order.

[1] According to the Bureau of Industry and Security (BIS), Department of Commerce, Ideal Aerosmith's 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System is classified under Export Control Classification Number (ECCN) 2B120. Items classified under ECCN 2B120 are controlled on the Commerce Control List (CCL) and require a license to be exported to Iran.

51. FIRSTFIELD was utilized by REJALI and KSP as the purchaser for the Rate Table, in part due to their ability to obtain an export license from the U.S. Department of Commerce for the Rate Table, from the U.S. to Portugal, and in part for their ability to provide an engineer capable of traveling to the U.S. to learn the system and to install it in Iran following transshipment. Though FIRSTFIELD was used to purchase the Rate Table from Ideal, TODI was used to move KSP's money through TODI's Chinese bank account to FIRSTFIELD to pay for it.

52. On May 29, 2015, REJALI emailed KSP employees with an attached quote for the 2002PG system. The quote was from TODI and listed the price of the 2002PG system, with additional packaged options, as 550,000 Euros.

53. Follow up emails regarding the purchase show that REJALI and FIRSTFIELD agreed that KSP would pay $500,000 for the 2002PG, not including the cost of training or installation.

54. On June 29, 2015, REJALI emailed GHASEMPOUR and XIONG, writing that he was transferring 298,008 Euros to their bank account for use on TODI, MODO and IBC projects. XIONG replied, asking REJALI to hold off on sending the money because he needed to detail the usage of the transfer to the Chinese bank before being able to access the money. XIONG stated that before he could detail the usage, he would need to find a suitable Chinese factory willing to provide the false documentation required to show Chinese Customs before the transfer would be released by the bank. XIONG wrote that this is illegal in China and would up the cost of moving money through China. Subsequent emails show that REJALI intended that the money to be used for the 2002PG Rate Table be procured through TODI. In these emails, XIONG emphasized that they needed the 2002PG specifications in order to find a suitable Chinese factory and that REJALI should call GHASEMPOUR if he had any questions.

55. On July 26, 2015, XIONG emailed REJALI, asking what the 298,008 Euros payment was to be used for. REJALI replied to XIONG and GHASEMPOUR that the $150,000 was to be used for the 30% down payment on the 2002PG Rate Table.

56. On July 27, 2015, REJALI emailed FIRSTFIELD, writing that the 30% deposit for the 2002PG had been paid and that FIRSTFIELD should "start the project." Attached to the email is an Online Banking Transaction Summary showing a wire payment of $150,000, made on July 27, 2015, from MODO to FIRSTFIELD. In other words, GHASEMPOUR, through his company MODO, made the down payment needed to start the manufacture of the 2002PG Rate Table. On or about September 30, 2015, FIRSTFIELD sent Ideal Aerosmith this down payment.

57. Ideal Aerosmith built the 2002PG Rate Table. On March 26, 2016, engineers working for FIRSTFIELD entered the U.S. and went to Ideal Aerosmith to test the Rate Table and to receive training on its use and calibration. The engineer's trip for the training lasted one week.

58. On January 14, 2016, HSI contacted Ideal, regarding possible sales to FIRSTFIELD. Ideal provided HSI the sales order for the 2002PG system to FIRSTFIELD, through Ideal's Spanish distributor, Alava Ingenieros ("Alava"), located in Madrid, Spain. FIRSTFIELD agreed to purchase the 2002PG system for $341,175.00, which included training for FIRSTFIELD's engineers on-site at the Ideal facility.

59. Ideal's 2002PG system required an export license from BIS. Ideal provided HSI with BIS Export License D1034340, dated October 21, 2015. The license authorizes Ideal, through Alava, to export one (1) 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System to the Ultimate Consignee, FIRSTFIELD at Praceta das Descobertas no2, Loja A, Agualva Cacem 2735-095, Portugal. The 2002PG system has an ECCN designation of 2B120, relating to motion simulators or rate tables (equipment capable of simulating motion), with certain specified characteristics. According to the regulations, export control is required because the system can be used for missile technology and to promote anti-terrorism. Ideal confirmed to HSI that the 2002PG system can be used for military grade navigation devices, missiles and smart devices.

## FAILURE TO OBTAIN A LICENSE

60. At no time did KSP, REJALI, GHASEMPOUR, or XIONG obtain a license from OFAC, located in the District of Columbia, to export any of the U.S.-origin goods set forth above from the United States to Iran.

61. Ideal Aerosmith applied for, and was granted, a license from BIS for FIRSTFIELD to purchase and receive the 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System for shipment to Portugal. However, evidence shows that FIRSTFIELD had no intention of abiding by the license and purchased the Rate Table at the behest of REJALI and KSP for end use in Iran, contrary to the granted license.

## CONCLUSION

Based on the abovementioned facts, I submit there is probable cause to believe that GHASEMPOUR and others knowingly and willfully conspired to export controlled US technology (that is, the 2002PG-28-TL-SR120 Two Axis Positioning and Rate Table System manufactured by Ideal Aerosmith) to Iran without a license, in violation of 18 USC § 371; the IEEPA, 50 USC §1705; and the ITSR, 31 CFR Part 560.

I am assigned to the HSI Office in San Diego, CA. I request permission to apply for this arrest warrant telephonically, and authorize the undersigned AUSA to sign on my behalf, pursuant to Rule 4.1, Fed. R. Crim. P.

________________________________________
Robert Pinches, Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn before me TELEPHONICALLY this______day of March, 2017.

________________________________________
United States Magistrate Judge